CORPORACIÓN AZUCARERA SAURÍ & SUBIRÁ, Petitioner *v.* SUGAR BOARD OF PUERTO RICO, Respondent.

No. 8. Argued July 8, 1954.—Decided November 5, 1954.

376

*Rivera Zayas & Rivera Cestero* for petitioner. *Alejandro Romanacce* for respondent.

MR. JUSTICE MARRERO delivered the opinion of the Court.

On July 6, 1950, Julio Rosado Cruz and the Corporación Azucarera Saurí & Subirá, the latter as owner of the Central Constancia,[1] executed public instrument No. 43 before a

---

[1] Hereinafter we shall refer to Rosado Cruz as "the colono" and to the Corporación Azucarera Saurí & Subirá as "the Central."

notary, embodying a "Contract for the Grinding of Cane."[2] In accordance with that instrument, the colono, owner of three small rural properties, bound himself: to plant and cultivate for the 1950–51 to 1959–60 crop seasons six cuerdas of sugar cane of certain specified varieties, including in the contract all cane, in addition to that mentioned, which might be produced by the farms in question in each of such seasons; to maintain the farms in good condition and not to cut the cane until ordered by the Central, as well as to furnish only good, healthy, and fully-ripe cane, placing it on trucks or wagons to be transported to the Central; to deliver during each season ten or more tons of cane per day; to run the risk and bear all the expenses of cultivation of his cane plantations from the tilling of the soil to the trucking and wagoning of the cane, as well as to submit before October 1 of each year a written report of the cane which he expects shall ripen in each of the months of the following season, to enable the Central to make the necessary arrangements before ordering the cutting, transportation, and grinding of the cane under the contract; to be present and to weigh the cane on the steelyard which the Central has installed in the *batey* of its factory, to which end he may designate an inspector and the necessary assistants near the steelyard and laboratory of the Central to observe and intervene in determining the tonnage of each truck and wagon; not to enter into any agreements with other persons for the sale of the cane that might be produced by the three farms in question; and to record the contract for the grinding of cane with preference over any other lien.

By virtue of this contract, the Central undertook the transportation to the mill of the colono's cane, its protection against accidents and shrinkage, as well as the payment to the colono of the compensation which may be fixed by the Public Service Commission of Puerto Rico, or any other agency or officer of the Insular or Federal Government, in the event the hauling and transportation of the cane were under-

---

[2] See Act No. 37 of March 10, 1910 (Sess. Laws, p. 119), as amended.

taken by the colono, such hauling and transportation to be governed by such legal rules, regulations, or orders as may be issued by the Public Service Commission pursuant to Act No. 221 of 1942 (Sess. Laws, p. 1176) and its amendments, or in harmony with any other existing regulations of any insular or federal agency; and to permit the presence of a representative of the colono and of the necessary assistants so that they may observe and intervene in determining the tonnage of each truck and wagon, and to give them reasonable facilities to carry out their commitment, with the right to transfer in whole or in part to his successors the contract with all or part of his rights, privileges, or consequences. For the sake of clarity, the contract further stated that the Central would organize its work for each grinding season, relying upon the prompt delivery of the cane by the colono, and that the prompt delivery of the cane was necessary for the proper functioning of the factory work during such period, and that the failure of the colono to plant, cultivate, and deliver the cane as covenanted in the grinding contract would cause serious and irreparable damages to the Central; it being further understood that the contract is in all respects subject to any valid limitation or restriction imposed by the Insular or Federal Government under the law in force limiting the sugar production, to the Central as well as to the colono, each party agreeing to comply with all valid orders and restrictions issued by the Government for the control of the sugar industry. In addition to the foregoing, it is further stated in the contract that the Central shall be under no obligation to pay to the colono for the cane he is unable to deliver, or that the Central is unable to grind owing to provisions of the Federal or Insular Government, or of any agency or officer of those governments, the Central being further relieved of any contractual obligations to make advances for the cutting and hauling of such cane and other expenses in connection therewith.[3] The contract thus executed was recorded on

---

[3] We have copied at length the grinding contract in order to distinguish the obligations contracted by each party thereto.

July 28, 1950, by the Registrar of Property in the Register of Agricultural Contracts of Ponce.[4]

Thus, on August 19, 1953, the colono wrote to the Sugar Board of Puerto Rico advising that under Art. IV of its Regulations he wished to shift the grinding of his cane from Central Constancia of Ponce to Central San Francisco of Guayanilla. The Central objected in writing. A hearing was held before the Sugar Board at which both parties were present. On October 29, 1953, the Board issued an order overruling the Central's opposition and directing the colono to grind his cane for the 1954 season in Central San Francisco. That order is based on "A Statement of Facts, Opinion, and Order" which reads as follows:

"Under the terms of the formal contract, the Central does not bind itself to make any kind of crop loans to the colono for the cultivation of his cane . . . Although under the ten-year grinding contract executed by the colono and the Central the latter is not bound to make crop loans to the colono, some of these vouchers [referring to the different amounts delivered by the Central to the colono as advances] constitute evidence of advances for agricultural crop loans. The Central advanced no money to the colono in 1953, by way of crop loans, for 1954; hence, there is no crop-lien contract between the colono and the Central for the 1954 grinding season.

"The cane of colono Juan Rosado Cruz (sic) which was ground by Central Constancia in the 1949–50 (sic) season was new, and the colono was at that time a new colono of the Central.

"This Board takes judicial notice of the fact that on July 6, 1950, on which date the contract between the Central and the colono was executed, there was in force a zoning order issued on April 12, 1944, by the Public Service Commission, directing and limiting every sugar central to grind such cane as came from the same lands as the cane ground in the 1942–43 season, and forbidding every central to grind cane for new colonos, or cane from newly cultivated lands, unless previously authorized by the Public Service Commission.[5] The records of the Public

---

[4] The parties executed the cane-grinding contract after obtaining proper authorization from the Production Marketing Association.

[5] The dispositive part of the zoning order issued on April 12, 1944 by

Service Commission which are on file with this Board by legislative command do not disclose that the Central Constancia of Ponce requested leave to grind the cane of Julio Rosado Cruz during the 1949–50 or 1950–51 crop season.

". . . . . . . .

"By virtue of the power conferred upon us as administrative agency by the Sugar Act, this Board ordered its chemist-inspector, Angel Carrero Ruiz, to examine the files and records of the Central Constancia and inquire how the cane of colono Julio Rosado Cruz had been liquidated during the 1950–51, 1951–52, and 1952–53 crop seasons. The chemist-inspector's report is made a part hereof.

". . . . . . . .

"By virtue of the contract in question, the Central binds itself to grind the cane of the colono, and the colono to send his cane to the Central Constancia for a period of ten consecutive grinding seasons. Such obligation was imposed on the colono and on the Central by the law in force at the time the contract was executed. The requirement provided by § 1213 of the Civil Code [6] does not therefore exist. . . . It being the legal duty of the Central in the instant case to grind the cane of the colono, the consideration necessary to render the grinding contract valid is therefore lacking. Moreover, the contract is not valid as against public policy and the laws, since the Central failed to ask the Public Service Commission for the permission required by the order entered by the latter on April 12, 1944.

". . . . . . . .

the Public Service Commission reads as follows:

"Therefore, the Commission resolves:

"(1) To order, as it does hereby order, that every sugar central in Puerto Rico subject to the jurisdiction of the Commission shall be limited to grinding cane from lands which produced cane ground during the 1942–43 crop season;

"(2) To forbid, as it does hereby forbid, every central to grind the cane of a *colono* who, during the 1942–43 crop season, ground his cane in another central, or the cane of new *colonos*, or the cane from newly cultivated lands, unless previously authorized by the Public Service Commission.

"(3) To order, as it does hereby order, that notice of this order be served individually on every sugar company of Puerto Rico, and that it be published for the information of all *colonos* and the public in general."

[6] Section 1213 of the Civil Code provides:

"There is no contract unless the following requisites exist:

"1. The consent of the contracting parties.

"2. A definite object which may be the subject of the contract.

"3. The cause for the obligation which may be established."

"To agree to pay to the colono 65% of the yield of his cane . . . does not constitute sufficient consideration . . . according to the report submitted by the chemist-inspector of this Board . . . which is filed of record . . . During three consecutive years, 1950–51, 1951–52, and 1952–53, the colono has received 66.125, 66.969, and 67.175 per cent respectively from the yield of his cane, as provided by the federal and insular regulations in force. To secure to the colono a smaller share than that which he has received for many years under the protection of the laws establishing minimum share to the colono, cannot constitute a valid consideration . . .

". . . . . . . .

"Merely complying with the laws in force at the time the contract was executed and those which may be enacted hereafter, is not sufficient consideration in itself to compel a colono to surrender that freedom . . . The Board . . . is of the opinion that the grinding contract . . . contravenes the spirit of the Sugar Act of 1951 [7] and the public interest."

The Central timely moved for reconsideration of the order issued by the Board. After a hearing, reconsideration was denied. Thereupon the Central filed a petition in this Court [8] in which, after reciting briefly the facts on which its petition is founded, it alleges that the Board committed the following errors: (1) in applying retroactively to the aforesaid grinding contract the provisions of the Sugar Act of Puerto Rico, thereby exceeding its administrative powers and exercising judicial powers which it does not have, impairing contractual obligations, jeopardizing rights acquired under prior legislation, and depriving petitioner of its property without due process of law; (2) in adjudging null and void the grinding

---

[7] Act No. 426 of May 13, 1951 (Sess. Laws, p. 1138), known by the short title of "Sugar Act of Puerto Rico." According to § 3 of the Act:

"For a colono to be entitled to shift from the central where he grinds his canes to another central, he shall be under obligation to notify the centrals concerned of his intention to make said change not later than the first day of November prior to the grinding season in which he desires to make such change.

"The central shall be bound to grind the cane of the new colonos, unless the Board exempts the central from such obligation after it is shown to the Board that the central lacks sufficient capacity to assume the grinding of the cane from such colonos."

[8] See § 33 of Act No. 426 of 1951, supra.

contract for lack of consideration, concluding that the reciprocal obligations assumed by the contracting parties were duties imposed by law, which could not therefore constitute a valid consideration for the contract; (3) in not holding that the period of ten grinding seasons fixed for the duration of the contract constituted sufficient consideration at law, since the manifest intention of the parties was to establish the business or joint venture for the production and sale of cane and sugar on a reasonably permanent and stable basis which would insure an annual average of tons of sugar sufficient to guarantee the financing of the enterprise, to render feasible the granting of agricultural loans to the colonos, and to improve and promote the technical efficiency of the mill for the benefit of the colonos, the Central, and the sugar industry in general; (4) in not finding that the petitioner bound itself, by a separate private agreement and in consideration of the delivery and grinding of the cane, to finance the colono, at his request, during the contract period, and in not finding that this contract of advances constituted by itself a sufficient and valid consideration for the contract for the grinding of cane; (5) in confusing the consideration of the contract with the subsequent execution thereof, deciding that the manner in which the Central liquidated and paid the colono's share showed that the contract lacked valid and sufficient consideration; (6) in declaring the existence and application to the instant case of a zoning order of the Public Service Commission of April 12, 1944, limiting every sugar central to grinding cane produced by certain lands, and forbidding every central to accept new colonos without the Commission's previous authorization; and (7) in deciding the case upon the evidence procured and obtained by it *motu proprio* after the termination of the hearing, without giving previous notice to and hearing the petitioner, in violation of due process of law.

Petitioner discusses the seven assignments thus made in an exhaustive brief. In reply to that brief, the respondent

Board maintains that "there is no question that if the Sugar Act in force and Act No. 221 did not exist at the time the grinding contract in dispute was executed, such contract would have been clearly legal since there were mutual promises, namely, the colono's obligati.n to furnish his sugar cane to the Central Constancia was une basis of the Central's obligation to grind such cane in its mill." It argues, however, that according to § 4 of the Civil Code, 1930 ed., "Acts executed contrary to the provisions of law are void except when the law preserves their validity," [9] and that since the colono and the Central failed to comply with the order of the Public Service Commission of April 12, 1944, forbidding any central to grind cane for new colonos unless previously authorized by the Public Service Commission, the contract executed by them was null and void.

In reply to the Board's contention, the Central maintains that this Court held in *Cía. Azucarera Toa* v. *Public Serv. Comm'n*, 71 P.R.R. 197, and in *Godreau & Co.* v. *Public Service Comm'n*, 71 P.R.R. 608, that the general regulations of the Public Service Commission, fixing the temporary rates to be charged by the centrals to the colonos for grinding their cane, were invalid; that thenceforth the centrals were free to contract with the colonos for the price or percentage of yield which they were entitled to receive for their cane, and that when the temporary rates went out of force all the provisions of such general regulations dealing with grinding services, etc., to the colonos, among which is Art. 15 (*a*) thereof, which provided that "each company is limited to grinding cane from lands which produced cane ground at the central during the 1943 crop, except where the ·Commission has authorized transfers," also fell by the wayside and became in-

---

[9] Section 1207 of the Civil Code, 1930 ed., also provides that:

"The contracting parties may make the agreement and establish the clauses and conditions which they may deem advisable, provided they are not in contravention of law, morals, or public order."

valid. The Central next maintains that in *Godreau, supra*, this Court stated at pp. 619–621 as follows:

". . . But in lumping rates and services together in § 21, the Legislature recognized that rates, services and facilities are inextricably woven together. That is to say, the Commission could not order services to be rendered without at the same time or previously fixing the rates to be charged therefor. To hold otherwise would be to ignore the mandate of the Legislature that each company shall receive a fair return on the fair value of its property.

" . . . . . . . .

"It is obvious that those provisions of the General Regulations which directly affect the services to be rendered by the companies cannot stand for two reasons. In the first place, they are void because of the failure of the Commission to date to fix valid rates, temporary or permanent, to be charged therefor. *Compañía Azucarera del Toa* v. *Public Service Commission, supra*. In the second place, apart from the fact that services may not be ordered by the Commission without fixing rates therefor, the so-called Regulations herein, to the extent that they directly affect services to be rendered by the companies, are not general regulations at all but individual orders which, as we have seen under Acts Nos. 70 and 221 require a hearing, testimony, findings of fact, and orders subject to judicial review. And these required steps were not taken here.

"It cannot be gainsaid that due to the failure of the Commission (1) to fix rates and (2) to hold hearings, make findings of fact and enter orders subject to judicial review, those provisions of the General Regulations which directly affect the services to be rendered by the companies are invalid. . ."

It is true that in the *Toa* and *Godreau* cases *supra* we expressed ourselves in the manner indicated by petitioner; however, neither the holdings therein nor the above quotation has the scope given by petitioner. As to the allegation that the Commission could not fix temporary rates unless some procedure for fixing permanent rates was being contemplated, we are altogether in accord. However, the last-cited case dealt with the power of the Commission to fix and determine prices, rates, tariffs, etc., in consonance with § 21 of Act No. 221 of 1942, which converted the central into

public-service companies. In that case we stated (p. 616) that the Commission had followed therein "the procedure laid down for promulgating general regulations rather than that provided for orders affecting individual cases." We also held (p. 621) that "It cannot be gainsaid that due to the failure of the Commission (1) to fix rates and (2) to hold hearings, make findings of fact and enter orders subject to judicial review, those provisions of the General Regulations which directly affect the services to be rendered by the companies are invalid," and that under this category fall "Article 7, providing for hauling and delivery of cane; Article 11, providing for liquidation of cane and disposition and payment of sugar; Article 12, providing for liquidation of molasses; and Article 19, providing for rates to be charged," and that "the remaining regulations are in a different category." Among these remaining regulations is Art. 15 (a), which provides as already indicated. Thus, far from holding in the last-cited case, as contended by petitioner, that Art. 15 (a) had fallen by the wayside, we stated clearly that it fell into a different category; and with respect to that and other articles, we dismissed the proceeding for lack of jurisdiction.

The order of the Public Service Commission of April 12, 1944 was not entered under the authority of § 21 of Act No. 221 of 1942, but rather in consonance with the provisions of § 42 thereof, which provides that:

"Within one year counting from the date of approval of this Act, the Commission shall proceed to determine and to put in force the production zone of every sugar company and of every natural or artificial person who is engaged in Puerto Rico in the manufacture, processing, or refining of sugar."

By virtue of that order, the Commission resolved (1) to order that every sugar central of Puerto Rico shall be limited to grinding cane from lands which produced cane ground in the 1942–43 crop season;[10] (2) to forbid every central to grind

---

[10] So far the order of April 12, 1944 is almost identical with Art. 15 (a) of the regulations of the Commission construed in *Godreau & Co.* v. *Public Service Comm'n, supra.*

the cane of a colono who during the 1942–43 crop season ground his cane in another central, or the cane of new colonos, or cane from newly cultivated lands, unless previously authorized by the Public Service Commission; and (3) to order that notice of its order be served individually upon every sugar company of Puerto Rico, and published for the information of all colonos and public in general.[11]

That order, the scope of which was but to authorize the continuation of cane grinding in the same manner as during the 1942–43 crop, and to prohibit a central from accepting cane of a colono who in that year ground his cane in another mill, or cane of new colonos, or from newly cultivated lands, without the previous authorization of the Public Service Commission, was an altogether valid regulation adopted pursuant to the aforesaid statutory precept (§ 42 of Act No. 221 of 1942).

It is conceded by all that Rosado Cruz was a new colono. Therefore, the previous authorization of the Commission to grind his cane was necessary. Since the record does not disclose in any form that the authorization of the Public Service Commission was obtained prior to the execution of the contract between colono Rosado Cruz and the Central, petitioner herein, the contract made by them was wholly void. We say this because the order of the Commission of April 12, 1944, adopted under a statute conferring authorization therefor, had the force of law and the Board could take judicial notice of such order. *Molini* v. *Sociedad Mario Mercado e Hijos*, 73 P.R.R. 873, 879. And furthermore, under § 4 of our Civil Code, "Acts executed contrary to the provisions of law are void except when the law preserves

---

[11] According to § 102(32) of the Law of Evidence, "it is a controvertible presumption that the law has been obeyed." Consequently, the presumption is that the provisions of paragraph 3 of the order of April 12, 1944 were complied with, and, hence, that the Public Service Commission served notice of such order individually upon each of the sugar companies of Puerto Rico, and that the same was published for the information of all *colonos* and the public in general.

their validity." The term "void," as employed in that Section, means that it is void per se, nonexistent. It has thus been construed. In his treatise on *"Derecho Civil Español Común y Foral,"* 6th ed., José Castán Tobeñas expresses himself as follows in vol. 2, pp. 642–43:

"The term *nonexistence* is not employed in our Civil Code (it speaks, in general, of void acts only) . . .

". . . . . . . .

"A contract may be considered nonexistent or absolutely void under our law in the following instances:

". . . . . . . .

"b) Whenever the contract has been executed in violation of a legal provision or prohibition, founded on reasons of public order (hypothesis of § 4 of the Code); . . ."

At p. 7, vol. 1 of his *Digesto*, Oyuelos says:

"No covenant, agreement, or contract shall be deemed to exist between those who contracted against the legal prohibition. . . . (7) covenants against the law are invalid."

In its judgment of April 1, 1931, 199 *Jur. Civ.* 397, the Supreme Court of Spain says that "the nullity referred to in § 4 of the Civil Code stems from the violation of certain prohibitory laws, the oversight or ignorance of which is sufficient to so declare, which is different from voidable acts."

■ Since the contract for the grinding of cane made by the colono and the Central is nonexistent and void per se, the order of the Board could in nowise impair the obligation of that contract, nor consequently deprive petitioner of its property without due process of law.

■ However, the Board committed an error which, although it does not affect the ultimate result reached by us, is well to mention in order that administrative agencies such as the one herein involved may not persist in committing the same. The Board states in its opinion that, under the authority of the power with which it is clothed, it ordered its chemist-inspector to examine the files and records of the Central in order to ascertain the manner in which the colono's

canes were liquidated during several crop seasons, it caused that report to be incorporated in its order and took the same into account when passing upon the case under its consideration. The Board acted in that fashion without giving petitioner an opportunity to intervene with respect to that evidence. As stated in *Escudero* v. *Minimum Wage Board*, 66 P.R.R. 561, 565:

"If the Board deems it necessary, after the close of a public hearing and before issuing a decree, to obtain by investigation information which it proposes to take into consideration in deciding a case, it must as a matter of due process make the results of such investigation known to the interested parties and give them an opportunity for cross-examination and rebuttal before deciding the case."

The action of the Board in this respect was therefore erroneous. However, in view of our conclusion on the non-existence of the contract, it is not a reversible error.

In view of the foregoing, we need not discuss the remaining assignments made by petitioner.

The order of the Sugar Board will be affirmed, with costs and expenses on petitioner.

Mr. Justice Negrón Fernández, Mr. Justice Ortiz and Mr. Justice Sifre did not participate herein.

Mr. Justice Belaval joins in the result.